UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,                               CASE NO. 24-20523

v.                                         HON. SUSAN K. DECLERCQ

RAPHAEL JERMAINE WILLIAMS, JR.,

      Defendant.
_____/

## SENTENCING MEMORANDUM

Raphael Williams, Jr., at just 22 years old, has experienced more trauma, grief, and terror than most will experience in a lifetime. Mr. Williams carries the heavy weight of it in his day-to-day life without having had any significant therapeutic treatment to address how these experiences impact him, his impulse control, and long-term decision-making.

Mr. Williams's advisory guideline range in this case is 21 to 27 months. He is subject to a sentencing enhancement under 18 U.S.C. § 1347 because he committed the instant offense while on pretrial release in Case No. 23-20199. By the time this Court sentences him, he will have

1

spent approximately 26 months in custody. Mr. Williams respectfully requests a sentence of time served, with a consecutive one day in custody pursuant to 18 U.S.C. § 1347, to be followed by a term of supervised release. In the alternative, he asks for a sentence of time served, with a consecutive one month in custody, resulting in an aggregate sentence of approximately 27 months, to be followed by a term of supervised release.

I. SENTENCING CONSIDERATIONS

a. Procedural History

Mr. Williams's case presents a complex and extended procedural history. Mr. Williams was initially prosecuted in Case No. 23-20199, pending before the Honorable Judith E. Levy. Following a detention hearing on March 6, 2023, Mr. Williams was ordered detained. Mr. Williams filed a motion to dismiss the indictment based on *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Judge Levy granted that motion on April 30, 2024. *See* Case No. 23-20199, ECF No. 41. The court placed Mr. Williams on bond on May 7, 2024, pending the government's appeal to the United States Circuit Court of Appeals for the Sixth Circuit. *See* ECF No. 51, 52. On July 10, 2024, a Petition for action on Conditions of Pretrial Release was filed and

the court scheduled a bond review hearing for July 15, 2024. Mr. Williams failed to appear, cut his tether, and was ultimately arrested on September 4, 2024. Mr. Williams consented to detention at that time and has been detained since. The government indicted Mr. Williams in the instant case on September 19, 2024.

On April 17, 2025, the Sixth Circuit reversed and remanded Mr. Williams's case back to Judge Levy. Mr. Williams will be sentenced by Judge Levy on September 16, 2025, less than a week after this Court sentences him.

### b. Nature and Circumstances of the Offense

Mr. Williams accepts responsibility and does not minimize the seriousness of his conduct—possession of a firearm as a convicted felon while on pretrial release for the same offense in a separate federal case, and while on probation for an unrelated state case. However, he asks that the Court balance the seriousness of the offense against his personal history and his commitment to treatment and personal life changes going forward.

### c. Mr. Williams's Personal History and Characteristics

During the pendency of this case—including the time spent waiting on the Sixth Circuit to resolve the appeal in Case No. 23-20199—Mr. Williams has made tremendous realizations about his trauma's impact on his conduct in this case, his day-to-day decision making, interaction with others, and perception of himself.

***"Maybe I fucked her life up by having me[.]"*** [1]

This is how Mr. Williams perceives his place in his mother's life—as a burden. His mother was only sixteen years old when she had him and faced her own struggles as a teenage mother to provide for him and his siblings. There were financial struggles, and as detailed in the sealed expert report, Mr. Williams witnessed and personally experienced abuse in the home. When Mr. Williams was just thirteen years old, his mother kicked him out of her house, starting a cyclical pattern of abandonment and estrangement. She did not just kick him out of her house—she cut contact with him. Counsel cannot sufficiently articulate the sense of heartbreak and betrayal this experience brought to Mr. Williams. Mr. Williams went to live with his father, who was always present in his life.

---

[1] Ex. A, Expert Report (to be filed under seal), at 3.

However, this relationship is estranged because of his father's stern, and at times abusive, disciplinarian tactics.

He was raised in Detroit, in an area colloquially known as "the Red Zone," an area plagued by violence, fear, and federal indictments. He recounts terrifying moments while trying to do normal things like walking to school with his younger sister and going to the corner store for snacks. Mr. Williams's life was inundated with violence, and at thirteen years old—during the same year his mother kicked him out of her home and ceased communication with him—he received his first juvenile conviction after running away from his father's home.

> *"I ran away from home for days and weeks, smoked weed to stay awake and to keep stuff out of my brain. I was staying high to keep out what I didn't want to think about, like missing my mama because my mama didn't want nothing to do with me. I used to act out to see if my mom would care, or act out to see if my dad would change his behavior. But it didn't work. I just wouldn't get new clothes or shoes. Sometimes we couldn't afford it anyway."* [2]

While juvenile detention ostensibly has rehabilitative goals, the only function it actually serves is punitive. As detailed in the sealed expert report, Mr. Williams was abused there as well. The adults trusted

---

[2] Ex. A, Expert Report (to be filed under seal), at 5.

to protect him did nothing. There was *nothing* rehabilitative about his experience. It was a violent environment and Mr. Williams was forced to adjust accordingly:

> *"I don't want to be aggressive like that, but some people forced me to be, to protect myself."* [3]

This is what incarceration does—it does not rehabilitate. Rather, incarceration programs people, especially people as young as Mr. Williams, to expect the worse and engage in hypervigilant and aggressive behavior. Facilities like the juvenile center where Mr. Williams was further abused, and the Bureau of Prisons, have little to no sustainable programming to achieve the multiple goals of sentencing. They simply punish and harm.

When he was released from his first stint in the juvenile facility when he was around sixteen years old, he began fighting with his father and his mother continued to be absent from his life. He was searching for community—for people who loved him, who accepted him, who made him feel like they wanted him to be around. Up until this point in his life, he had never experienced that in a meaningful way. He didn't have security

---

[3] Ex. A, Expert Report (to be filed under seal), at 5.

6

in his family. He didn't feel loved. He had developed a survival mindset. He was hypervigilant and scared. Mr. Williams had also began abusing substances. During his heaviest period of use, he was smoking eight to ten marijuana cigars per day, consuming one bottle of "lean" per day, and ingesting six Percocet and Xanax pills per day.

> ***"When you feel like you don't have family, you tend to make your own family. I was with people I felt like loved me. Obviously, I didn't feel that at home. I turned to gangs."*** [4]

One day, after running away from home, Mr. Williams was riding in a car with his new "family" and the car was shot up. He was shot three times in his arm, once in each shoulder, once in his leg, and once in his head. After this near-fatal assault, his mother came back into his life. Mr. Williams was happy to reconnect with his mother, but it did not last long. When she met a new boyfriend, she kicked Mr. Williams out of the house again. Mr. Williams experiences compounding grief from his mother's abandonment, his estrangement from his father, the unspeakable violence and harm he has suffered, and the loss of several loved ones to violence.

---

[4] Ex. A, Expert Report (to be filed under seal), at 5.

### *Trauma's Impact on Mr. Williams's Life*

The sealed expert report describes the devastating impact trauma has on Mr. Williams's psyche, perception of self and others, judgment, and impulse control. Mr. Williams has a very difficult time talking about his personal history, understandably so. Mr. Williams sat with Dr. Toya Jones, Ed.D., LCSW in preparation for sentencing. Dr. Jones diagnosed Mr. Williams with Post Traumatic Stress Disorder. Ex. A., at 3. Dr. Jones masterfully outlines the impact of trauma on Mr. Williams in her report, but counsel emphasizes the following:

> Mr. Williams has experienced extensive trauma that has caused impairment in his normal brain functioning. His traumatic experiences have disrupted the functioning of his Limbic System: the frontal lobe, amygdala, and hippocampus … The limbic system (alarm system) protects the body when it is in danger … Exposure to violence, such as Mr. Williams's victimizations, can cause his brain functions to become hyperactive and respond inappropriately to perceived danger … These disturbances in normal brain functioning most likely affected Mr. Williams's decision-making abilities. He described feeling unsafe, and the reason he possessed a firearm was out of fear that he would be shot again. When a trauma survivor feels vulnerable or unsafe around someone or something that reminds him of traumatic events he has experienced, he is limited in accessing the part of the brain that controls good judgment.

Ex. A, 7-8.

8

### d. Sentencing Rationale: Punishment, Deterrence, Protection of the Public, and Rehabilitation

Mr. Williams's history does not excuse his behavior, but it does give the Court guidance on how to meaningfully address the underlying cause of his behavior and put him in a position to be a better community member. Mr. Williams is a very young man—only 22 years old. While society considers him to be an adult, neuroscience research demonstrates that the prefrontal cortex of the brain does not reach majority until around age 25, and this part of the brain controls impulse control, complex decision-making, inhibition, and planning. *Id.*; *see also* U.S.S.C., [*Youthful Offenders in the Federal System*](), at 5 (May 2017) (noting a voluminous body of neuroscience research "recogni[zing] that people may not gain full reasoning skills and abilities until they reach age 25 on average"); Nico U.F. Dosenbach et al., [*Prediction of individual brain maturity using fMRI*](), Science (Sept. 10, 2010) (longitudinal study tracking brain development in 5,000 children and finding their brains did not reach full maturity until *at least* age 25). The Court should also consider that at the time of the offenses, Mr. Williams was suffering with severe substance abuse.

Mr. Williams has been in custody for a cumulative 26 months. He has already served a sentence at the top of his guideline range. This is also the longest he has ever been incarcerated. And, like his time at the juvenile detention facility, he has suffered abuse while in pretrial detention. In December 2024, while detained at the Milan Detention Center, Mr. Williams was stabbed in the eye and suffered a fracture to his orbital bone. The individual who stabbed him was under the influence of an unknown substance, and Mr. Williams had no previous issue with him. An extended prison sentence will not significantly increase any deterrent effect on Mr. Williams, or others, and will not serve any rehabilitative purpose. The belief that prison sentences are effective in deterring crime is a false narrative that is supported by neither empirical study nor evidence.

As to the protection of the public, a longer prison term in this case will not improve the safety of the community. Shon Hopwood, a well-respected law professor who spent over ten years in federal prison, explains how prison negatively affects a person's ability to reintegrate into the community and undermines public safety:

- There is an ever-present fear of violence in our gladiator-style prisons, where people have no protection from it, which causes

people to develop PTSD. Consequently, when formerly incarcerated people face conflict after being released, they are ill-equipped to handle it in a productive way.

- How American prisons are designed negatively impacts the ability of people to be self-reliant after their release. Prisons create social isolation by taking people from their communities and placing them behind razor wire, in locked cages. Through strict authoritarianism, rules, and control, prisons lessen personal autonomy and increase institutional dependence.

- The location of our prisons also causes harm. Many prisons are located far away from cities and hundreds of miles from prisoners' families. Consequently, family relationships deteriorate, impacting both prisoners and their loved ones.

- Prisons tend to rinse away the parts that make us human … Our prisons also foster an environment that values dehumanization and cruelty. At the federal prison in which I served for more than a decade, I watched correctional officers handcuff and then kick a friend a mine who had a softball-sized hernia protruding from his stomach. Because he was asking for medical attention, they treated him like a dog. There was little empathy in that place. And for over 10 years of my life, when those in authority addressed me, it was with the label, "inmate." The message every day, both explicitly and implicitly, was that I was unworthy of respect and dignity. Such as environment leads people to have a diminished sense of self-worth and personal value, affecting a person's ability to empathize with others. The ability to empathize is a vital step towards rehabilitation, and when our prison's fail to rehabilitate, public safety ultimately suffers.

Shon Hopwood, *How Atrocious Prison Conditions Make Us All Less Safe*, Brennan Center for Justice (Aug. 9, 2021), available at

11

https://perma.cc/PZ26-EZU8. Considering this, it is unclear what, if anything, will be accomplished by a lengthy term of custody that could not be accomplished just as readily while on intense supervision in the community. Indeed, research consistently shows that incarceration is not an effective way to change behavior and, more often, has a criminogenic effect. Mr. Williams is at a crossroads. His brain is still developing; now is the time for him to seek treatment and mentorship to reinforce his positive characteristics and dissuade him from engaging in negative behaviors. Mr. Williams has already begun the process, evinced by his vulnerability with Dr. Jones. Dr. Jones opines:

> Mr. Williams has been impacted cognitively and emotionally by his exposure to years of traumatic events, where his symptoms have gone untreated, and he has learned to cope with the trauma reactions in a maladaptive manner. However, he has shown introspection and accountability in his understanding in his past decision-making and trauma reactions. Therefore, it is my opinion that Mr. Williams would benefit from increased knowledge and exploration of his trauma symptoms and increased utilization of positive coping techniques to reduce automatic, protective reactions to perceived danger. He would also benefit from learning more adaptive coping tools to process his trauma symptoms and make better decisions for his future well-being. Until these trauma symptoms are addressed, he may continue to experience hypervigilance and lack judgment when his trauma memory is activated.

Ex. A, 11.

Mr. Williams, with counsel, has been preparing for life after incarceration. We have identified several resources for him to take advantage of, both through the Detroit Wayne Integrated Health Network and private centers, including:

1. **The Guidance Center**, which can provide assertive community treatment, a community recovery program, case management, individual placement and support, mental health and substance abuse disorder services, and psychiatric care;
2. **Team Wellness**, which provides therapy, peer support, mental health and substance use treatment;
3. **The Path to Peace**, which provides trauma-focused online counseling; and
4. **Center for Establishing Recovery**, which specializes in PTSD, anxiety, depression, and substance use treatment.

## CONCLUSION

Mr. Williams has so much potential to succeed in the community with the right treatment and support systems in place. He is maturing; counsel can attest to the growth Mr. Williams is exhibiting. Mr. Williams is ready to make the necessary changes in his life. The Court should place him in the best position to make those changes—a continued term of incarceration is not necessary, nor appropriate in this case. The appropriate response is intensive supervision with specific special conditions to include cognitive behavioral therapy, that he seeks

employment, and substance abuse treatment. An extended prison sentence will have the opposite intended effect—he will remain in an inherently violent environment that will inevitably result in continued trauma, all while his brain is still developing. That is greater than necessary, and in fact, is irreconcilable with the goals of sentencing.

Respectfully submitted,

**FEDERAL COMMUNITY DEFENDER**

*s/*Celeste C. Kinney
Attorney for Raphael Williams
613 Abbott St., Ste. 500
Detroit, MI 48226
(313) 967-5843
celeste_kinney@fd.org